IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE NATIONAL LACROSSE LEAGUE, INC., <br><br> Plaintiff, <br><br> v. <br><br> KINETIC LEAFSCIENCES CORP., <br><br> Defendant. | Civil Action No. _____ <br><br> **Jury Trial Demanded** |

# COMPLAINT

Plaintiff, the National Lacrosse League, Inc. ("Plaintiff" or "the League"), by and through the undersigned counsel, hereby files this Complaint against Defendant, Kinetic LeafSciences Corp. ("Defendant" or "KLS"), and in support thereof alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

2. This Court also has personal jurisdiction over Defendant KLS. KLS entered a contract with Plaintiff, a professional sports league headquartered in Philadelphia, Pennsylvania, giving rise to the claims asserted herein. The negotiation, review, and execution of the contract involved Plaintiff's personnel located in Pennsylvania. The contract contains a Pennsylvania choice of law provision, evidencing KLS's deliberate affiliation with the Commonwealth. KLS purposefully availed itself of the privilege of conducting business in Pennsylvania by reaching into the forum to establish a continuing business relationship with a Pennsylvania-based entity, and the claims asserted herein arise directly from that relationship.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, including negotiation, review and execution of the contract with Plaintiff's personnel located in this District.

## PARTIES

4. Plaintiff, the National Lacrosse League, Inc., is a New York not-for-profit organization with a principal place of business at 709 N. 2nd Street, Suite 400, #1119, Philadelphia, Pennsylvania 19123.

5. The League is a professional box lacrosse league comprised of fourteen franchises in the United States and Canada (the "Teams").

6. Defendant, Kinetic LeafSciences Corp., is a Nevada corporation with a principal place of business at 3 Bluehaven Drive, Oro-Medonte, ON L0L 1T0.

7. KLS produces, distributes, markets, and sells hydration products.

## FACTS

**A. KLS Contracts to Be The League's Exclusive Hydration Partner.**

8. In 2024, KLS sought to sponsor the League as its exclusive "hydration partner" by supplying the League and its Teams with hydration products in exchange for exclusive promotional opportunities.

9. Accordingly, on November 4, 2024, the League and KLS executed a Sponsorship Agreement, effective November 3, 2024 (the "Sponsorship Agreement") pursuant to which KLS agreed to be the League's exclusive official hydration partner. A true and correct copy of the Sponsorship Agreement is attached hereto as Exhibit A.

10. The negotiation, review, and execution of the Sponsorship Agreement involved Plaintiff's personnel located in Pennsylvania.

11. Pursuant to the Sponsorship Agreement, KLS agreed to pay to the League a defined sponsorship/marketing fee (the "Sponsorship Fee") in each year of the Agreement's three-year term. *See* Exhibit A, at § 3.1.

12. KLS also agreed to supply each of the League's individual Teams with $8,000.00 worth of KLS hydration and energy products at wholesale pricing, to be delivered no later than November 1 in each contract year. *Id.* § 3.2(a).

13. KLS further contracted to supply, at wholesale pricing, additional hydration products as ordered by the Teams at any point during each contract year. *Id.* § 3.2(b).

14. In exchange for KLS's commitment to pay the Sponsorship Fee and supply the League and its Teams with hydration products, the League agreed to provide KLS with exclusive opportunities to promote its products, including by designating KLS as the League's exclusive "Official Hydration Partner." *Id.* § 4.2.

15. Pursuant to Section 4.2 of the Sponsorship Agreement, the League promoted KLS and its products through multiple marketing activities, including but not limited to, displays on the League's in-venue signage and high-visibility dasher boards (with placements anchored near the home teams' benches for prime TV camera view), videoboard commercials played during each game, commercial spots and graphics packages displayed on broadcast media during all televised League games, weekly KLS-themed social media content across the League's social media channels, display advertising and interactive partnership branding throughout the League's digital network, including on its website, and KLS branding on the League's newsletter emails. *Id.*

16. Pursuant to Section 10(a) of the Sponsorship Agreement, the parties' rights and obligations "shall not be assigned or delegated by either party without the express written consent

of the other Party, and any such unauthorized assignment shall be invalid and of no force or effect." *Id.* § 10(a).

17. Because KLS was designated as the League's exclusive hydration partner under the Sponsorship Agreement, and in reliance on KLS's commitment to meet its obligations, the League and its Teams terminated any existing agreements with other suppliers and vendors of hydration products.

**B. KLS Breaches the Sponsorship Agreement.**

18. KLS has failed to satisfy its obligations under the Sponsorship Agreement.

19. Specifically, KLS has failed to pay the fee owed to the League under the Sponsorship Agreement and deliver the hydration products it agreed to supply.

**KLS Has Not Paid the Contractual Sponsorship Fee.**

20. The Sponsorship Agreement sets out a payment schedule for KLS's payment of the Sponsorship Fee, with two prorated payments due in each of the Agreement's three contract years. *Id.* § 3.1.

21. The first Sponsorship Fee, in the amount of $150,000.00, was due on December 15, 2024. *Id.*

22. On or about December 23, 2024, KLS made a partial payment of $50,000.00 toward the first Sponsorship Fee payment.

23. On or about December 30, 2024, KLS made a partial payment of $50,000.00 toward the first Sponsorship Fee payment.

24. On or about December 31, 2024, KLS made a partial payment of $25,000.00 toward the first Sponsorship Fee payment.

25. KLS has not paid the $25,000.00 balance remaining for the first Sponsorship Fee.

26. The second Sponsorship Fee payment, in the amount of $249,000.00, was due on or before March 31, 2025. *Id.* § 3.1.

27. KLS has not paid any amount of the second Sponsorship Fee.

28. The third Sponsorship Fee payment, in the amount of $364,500.00, was due on or before September 30, 2025. *Id.*

29. KLS has not paid any amount of the third Sponsorship Fee.

30. KLS thus has not paid $638,500.00 in Sponsorship Fees that are currently due and owing to the League pursuant to the Sponsorship Agreement.[1]

**KLS Has Failed to Supply the Hydration Products It Committed to Provide.**

31. As the League's exclusive hydration partner, KLS committed to provide the Teams with hydration products in advance of the following season and throughout the season. *Id.* § 3.2.

32. Specifically, KLS agreed to supply each League Team with $8,000.00 of KLS hydration products at wholesale pricing by November 1 of each contract year. *Id.* §§ 3.2(a), (c).

33. KLS also agreed to supply any additional KLS products at wholesale pricing as ordered by the League's Teams at any point during the term of the Sponsorship Agreement. *Id.* § 3.2(b).

34. KLS has not delivered *any* products to the Teams for the current 2025-2026 season.

35. On September 29, 2025, KLS informed the League that it was "undergoing a complete corporate restructure," and would be setting up a "new USA Nevada LLC." *See* Oct. 3, 2025 email from J. Rubino to A. Lougheed, attached hereto as Exhibit B. KLS expressed a desire "to make a new agreement with [the League] to reflect our new US corp." *Id.* In response, the

---

[1] The next Sponsorship Fee payment of $364,500.00 is due on March 31, 2026. Ex.A at § 3.1. If KLS does not pay the Sponsorship Fee by that fast-approaching date, the total unpaid balance due and owing to the League will increase to $1,003,000.00.

5

League sought additional information from KLS and prepared a draft assignment agreement to transfer KLS's obligations under the Agreement to the new corporate entity KLS was purportedly forming, though KLS did not respond to the League's request for information, and did not acknowledge the draft agreement.

36. In a meeting with League representatives on November 24, 2025, KLS advised that it was unable to deliver hydration products in time for the start of the 2025-2026 season pursuant to Sections 3.2(a) and 3.2(c) of the Sponsorship Agreement.

37. The Teams have not been able to purchase additional hydration products pursuant to Section 3.2(b).

38. KLS's failure to meet its obligations under Section 3.2 has required the Teams to source other hydration products from other suppliers.

39. This has caused reputational and financial harm to the League, as the League and its individual Teams terminated any previous agreements for hydration products in reliance on KLS's commitment to meet its obligations under the Sponsorship Agreement in exchange for exclusivity.[2]

**C. Despite Notice and the Opportunity to Cure, KLS Remains in Material Breach of the Sponsorship Agreement.**

40. Pursuant to Section 8.1 of the Sponsorship Agreement, in the event of a material breach, the non-breaching party shall provide the breaching party with written notice of the breach; if the breaching party does not cure within thirty (30 days), the non-breaching party may immediately terminate the Sponsorship Agreement. *See* Ex. A at § 8.1.

---

[2] KLS agreed to waive its category exclusivity under Section 4.2 of the Agreement until further notice, given its inability to supply hydration products and fulfill its obligations for the start of the 2025-2026 season. As a result of KLS's failures, the Teams had no choice but to source alternative hydration products. *See* Exhibit D (enclosing Nov. 25, 2025 email from K. Hunzeker to A. Lougheed and S. Sahanatien).

41. Pursuant to Section 8.1, on December 12, 2025, the League notified KLS that, due to KLS's failure to pay the contractual Sponsorship Fee and supply products to the League's Teams, KLS was in material breach of the Sponsorship Agreement. *See* Dec. 12, 2025 email from J. Rubino to A. Lougheed and S. Sahanatien, attached hereto as Exhibit C.

42. The League afforded KLS thirty (30) days, until January 11, 2026, to cure its material breaches. *See id.*

43. KLS did not cure its breaches of the Sponsorship Agreement by January 11, 2026.

44. Specifically, KLS did not pay the unpaid and overdue Sponsorship Fee amounts pursuant to Section 3.1.

45. KLS did not supply any hydration products to the Teams pursuant to Section 3.2.

46. Until January 13, 2026, the League continued to fulfill all its contractual obligations and deliverables under the Sponsorship Agreement for the 2025-2026 season, as it had since the effective date of the Agreement.[3]

47. On January 16, 2026, the League sent KLS a final demand to cure its breaches of the Sponsorship Agreement by remitting the unpaid Sponsorship Fee by January 30, 2026. *See* January 16, 2026 Demand Letter, a true and correct copy of which is attached hereto as Exhibit D.

48. Given KLS's material breaches and its failure to fulfill its obligations as the League's exclusive hydration partner, the League also demanded that KLS remove any references to the League, its Teams, and/or any individual League player(s) from its website(s).

---

[3] On January 11, 2026, the League notified the Teams to discontinue all activations, integrations, promotions, and uses of KLS branding, assets, or associated benefits tied to the partnership with KLS, including discontinuation of in-venue signage, digital integrations, promotional placements, social media references, and various broadcast elements. The League discontinued all promotion of KLS as of January 13, 2026.

49. Though KLS did remove references to the League and its Teams and players from certain pages of its website on January 20, 2026, KLS did not acknowledge or otherwise respond to the League's final demand.

50. KLS did not remit the unpaid Sponsorship Fee amount by January 30, 2026.

51. KLS has not cured its material breaches of the Agreement.

52. Section 10(b) of the Sponsorship Agreement provides that "[t]he laws of the State of Pennsylvania shall govern the validity, performance, enforcement, interpretation and any other aspect of this Agreement, without regard to principles of conflicts of laws thereunder." *See* Exhibit A, at § 10(b).

## COUNT I
## BREACH OF CONTRACT

53. The League incorporates by reference the allegations set forth in paragraphs 1 through 52 above as if more fully set forth herein.

54. The League and KLS entered the Sponsorship Agreement, pursuant to which KLS agreed to pay the Sponsorship Fee and supply hydration products to the League and its Teams at wholesale pricing in exchange for the League's promotion of KLS and its products.

55. The League performed its obligations under the Sponsorship Agreement by promoting KLS as its exclusive hydration partner and advertising KLS's products through multiple high-visibility marketing efforts and channels.

56. KLS breached the Sponsorship Agreement by failing to pay the Sponsorship Fee to the League.

57. KLS further breached the Sponsorship Agreement by failing to provide the League or its Teams with any hydration products for the 2025-2026 season.

8

58. As a proximate result of KLS's breach of the Sponsorship Agreement, the League has suffered and will continue to suffer damages in an amount to be proven at trial.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful interest, costs, and such other relief as the Court deems equitable, just and proper.

### COUNT II
### PROMISSORY ESTOPPEL
### (Alleged in the Alternative)

59. The League incorporates by reference the allegations set forth in paragraphs 1 through 52 above as if more fully set forth herein.

60. KLS promised and represented to the League that it would pay a sponsorship fee and provide the League and its Teams with hydration products starting in November 2024 until at least June 2027 in exchange for its designation as the League's "exclusive hydration partner."

61. KLS expected or should have reasonably expected that the League would rely upon KLS's promises and that such promises would induce action or forbearance on the part of the League.

62. The League and its Teams reasonably relied on KLS's promises and were induced thereby to terminate agreements with other vendors and suppliers for the supply of hydration products.

63. As a result of KLS's promises, the League and its Teams did not procure hydration products for the 2025-2026 season from any other vendors or suppliers of hydration products.

64. The League was further induced by KLS's promises to promote KLS as the League's exclusive hydration partner.

65. KLS has not performed pursuant to its promises, as it has not paid a sponsorship fee nor provided the League or any of its Teams with any hydration products for the 2025-2026 season.

66. As a result of KLS's failure to perform according to its promises, the League and its Teams have had to secure hydration products from other vendors and suppliers.

67. The League and its Teams have suffered financial and reputational harm by terminating agreements with other vendors and suppliers of hydration products in reliance on KLS's representations.

68. As a proximate result of KLS's failure to perform according to its promises, the League has sustained damages in an amount to be proven at trial.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful interest, costs, and such other relief as the Court deems equitable, just and proper.

## COUNT III
## UNJUST ENRICHMENT
## (Alleged in the Alternative)

69. The League incorporates by reference the allegations set forth in paragraphs 1 through 52 above as if more fully set forth herein.

70. At the request of KLS, the League has promoted KLS as its exclusive hydration partner and promoted KLS's products through multiple high-visibility marketing efforts and channels.

71. KLS enjoyed and accepted its promotion by the League without any objection.

72. The League has demanded payment from KLS.

73. KLS has wrongfully failed and refused to promptly pay the League for its promotion and support of KLS under circumstances that make it unjust for KLS to retain such benefit without paying the League the value thereof.

74. KLS's retention of the benefits it has received as a result of the League's promotion of KLS without paying the League violates the fundamental principles of equity, justice, and good conscience.

75. As a direct and proximate result of KLS's unjust enrichment, the League has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant, for damages in an amount in excess of the jurisdictional limits of this Court, together with all lawful interest, costs, and such other relief as the Court deems equitable, just and proper.

Respectfully Submitted,

**TUCKER LAW GROUP, LLC.**

Dated: February 18, 2026         BY: /s/ *Julian C. Williams*
　　　　　　　　　　　　　　　　　Rebecca M. Waddell, Esquire
　　　　　　　　　　　　　　　　　Chelsea Biemiller, Esquire
　　　　　　　　　　　　　　　　　Julian C. Williams, Esquire

　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff,*
　　　　　　　　　　　　　　　　　*The National Lacrosse League, Inc.*

## **VERIFICATION**

    I, Justin Rubino, verify that I am the Executive Vice President for Business Operations of the National Lacrosse League, Inc., and as such I am authorized to make this Verification on behalf of Plaintiff.  The foregoing Complaint is based upon information furnished to and/or gathered by counsel in the preparation of this lawsuit.  The language is that of counsel.  To the extent the contents are that of counsel, I have relied upon counsel in making this Verification.  I verify that I have reviewed the foregoing Complaint and that it is true and correct to the best of my knowledge, information, and belief.  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Date:  2/18/26                                                             _____